# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

|  |  |
|---|---|
| HARRISON MORGAN COTTONE<br>CHERDAK and<br>ERIK B. CHERDAK,<br><br>      Plaintiffs,<br><br>      v.<br><br>ACT, INC.,<br><br>      Defendant. | Civil Action No. TDC-19-1513 |

## MEMORANDUM OPINION

Plaintiffs Harrison Morgan Cottone Cherdak and Erik B. Cherdak (collectively "the Cherdaks") have filed a civil action against Defendant ACT, Inc. ("ACT"), in which they allege that ACT wrongfully decided to cancel Harrison Cherdak's April 2018 test score on the ACT standardized college admission test. Following removal of the case to federal court, ACT filed a Motion to Compel Arbitration and Stay Proceedings or, in the Alternative, to Dismiss for Failure to State a Claim in which ACT contends that the dispute must be resolved in arbitration before the American Arbitration Association. In turn, the Cherdaks have filed a Motion for a Preliminary Injunction seeking to prevent ACT from canceling the April 2018 test score before the resolution of this case. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, ACT's Motion will be GRANTED IN PART and DENIED IN PART, and the Motion for a Preliminary Injunction will be DENIED.

# BACKGROUND

Harrison Cherdak is a 2019 graduate of a high school in Montgomery County, Maryland. His father, Erik Cherdak, is a Maryland resident and joins in this action as a co-Plaintiff. The Cherdaks are both self-represented. ACT is a non-profit educational organization based in Iowa City, Iowa that prepares and administers the national ACT standardized test used by many colleges and universities in their undergraduate admissions process. The ACT is intended to measure students' abilities across various educational subjects, and the overall results of the test are provided to test takers in a Composite score. The highest possible Composite score is 36.

In December 2017, as a high school junior, Harrison Cherdak took the ACT for the first time and earned a Composite score of 24 out of 36. He then took a test preparation tutorial program and registered for the April 2018 administration of the test using ACT's online registration process. Students who register online must agree to a set of terms and conditions in order to complete the registration process. While registering for the April 2018 test, Harrison Cherdak agreed to ACT's 2017-2018 Terms and Conditions: Testing Rules and Policies for the ACT® Test ("Terms and Conditions"). When Harrison Cherdak sat for the April 2018 test in Montgomery County, Maryland, he was also required to affirm in writing on his answer sheet that he agreed to comply with and be bound by the same Terms and Conditions provided during his registration process. Harrison Cherdak received a composite score of 32 out of 36 on the April 2018 administration of the test.

## I. 2017-2018 Terms and Conditions

The 2017-2018 Terms and Conditions are contained in a document that states, in relevant part, that by "registering for and/or taking the ACT test," the test taker agrees "to be bound by, and will comply with, these Terms and Conditions and other ACT policies for the ACT test[.]" Terms

and Conditions ("T&C") at 4, First Amended Complaint Ex. 1, ECF No. 19-1. The Terms and

Conditions provide that the ACT may conduct an "Individual Score Review" if it suspects a reason

to invalidate a test score and may, in fact, cancel the test taker's score. *Id.* at 6. The terms relating

to Individual Score Reviews ("the ISR Provision") provide that:

> **Individual Score Reviews**
> If ACT discovers any reason to believe your score may be invalid—such as evidence of unusual similarities in the answers of you and another examinee, evidence that you may have falsified your identity or impersonated someone else, evidence of possible advance access to test questions or answers, or other indicators the test scores may not accurately reflect your level of educational achievement— ACT may conduct an Individual Score Review. **ACT reserves the right to cancel test scores when there is reason to believe the scores are invalid. Proof of misconduct is not required to cancel scores.**
>
> ACT will take steps to notify you if ACT decides to conduct an Individual Score Review. The notice includes information about why ACT has started the Individual Score Review and options available for resolving it. If the scores that are the subject of the Individual Score Review have not yet been reported by ACT, ACT reserves the right to hold those scores pending the outcome of the review process, including any appeal. More information regarding the review process will be provided to you if ACT opens an Individual Score Review regarding your score.

*Id.* Included in the ISR Provision is a clause requiring that any dispute relating to the ISR

be resolved through binding arbitration ("the ISR Arbitration Clause"):

> **For Individual Score Reviews, the final and exclusive remedy available for you to appeal or otherwise challenge a decision by ACT to cancel your test score is binding arbitration.** The arbitration will be conducted through written submissions to the American Arbitration Association ("AAA"), unless both you and ACT agree to submit the matter to an alternative arbitration forum. **By agreeing to arbitration in accordance with these Terms and Conditions, you are waiving your right to have your dispute heard by a judge or jury.** If you choose to appeal a decision by ACT to cancel your test scores by exercising your right to seek arbitration of that decision, you must pay a nonrefundable filing fee of $200 to the AAA (or alternate forum) as your share of the filing fee, and ACT will pay the remainder of the filing fee. Your share of the filing fee is payable in full when a request for arbitration is filed with the AAA, but will be reimbursed by ACT if you prevail in arbitration and your scores are not cancelled. The only issue for arbitration will be whether ACT acted reasonably and in good faith in deciding to cancel the scores. No damages may be awarded by the arbitrator and each party is responsible for its own fees and expenses, including attorneys' fees, except as

otherwise expressly provided in these Terms and Conditions. No arbitration involving the outcome of an Individual Score Review may be maintained as a class action, and the arbitrator shall not have the authority to combine or aggregate the disputes of more than one individual, conduct any class proceeding, make any class award, or make an award to any person or entity not a party to the arbitration.

*Id.* Within the Terms and Conditions, a second arbitration provision ("the General Arbitration Clause") governs all other disputes that do not involve Individual Score Reviews:

> **Arbitration of Disputes with ACT**
> All disputes—other than disputes involving "Individual Score Reviews" (described above) or infringement of ACT's intellectual property rights—that relate in any way to registering for or taking the ACT test, requesting or receiving accommodations or supports on the ACT test, the reporting of ACT test scores or the use or disclosure of personal information by ACT, shall be resolved by a single arbitrator through binding arbitration administered by the American Arbitration Association ("AAA"), under the AAA Consumer Rules ("AAA Rules") in effect at the time a request for arbitration is filed with the AAA. Copies of the AAA Rules can be located at **www.adr.org**. No arbitration may be maintained as a class action, and the arbitrator shall not have the authority to combine or aggregate the disputes of more than one individual, conduct any class proceeding, make any class award, or make an award to any person or entity not a party to the arbitration. **By agreeing to arbitration in accordance with these Terms and Conditions, you are waiving your right to have your dispute heard by a judge or jury.**
>
> Each party will be responsible for its own fees and expenses incurred in connection with the arbitration, regardless of the outcome of the arbitration, except as otherwise expressly provided in these Terms and Conditions. In no event shall ACT be liable to an examinee for any special, indirect, consequential, exemplary, or punitive damages.
>
> **NOTE:** Separate procedures apply to arbitration proceedings involving Individual Score Reviews. Those procedures are discussed above, under the heading "Individual Score Reviews."

*Id.* at 7. Finally, the Terms and Conditions state that they are "subject to change until 48 hours prior to your test date." *Id.* Registrants are instructed: "You agree to check (**www.act.org/the-act/terms.html**) for revised Terms and Conditions at that time, and if you do not agree to the applicable terms, to notify ACT prior to the test of your intent to cancel your registration pursuant to this provision." *Id.*

4

## II.    Individual Score Review

On September 28, 2018, ACT notified Harrison Cherdak by letter that it was instituting an Individual Score Review ("ISR") pursuant to the Terms and Conditions due to apparent irregularities with his April 2018 test. Specifically, ACT stated that the increase in his subject matter and overall composite scores was greater than it typically observes, and that there were an unusually high number of identical responses and identical incorrect responses on his answer sheet when compared with another examinee's answer sheet. ACT informed Harrison Cherdak that he could opt either to: (1) cancel his April 2018 score; (2) take a private retest at ACT's expense, for the purpose of confirming the validity of the April 2018 score; or (3) provide certain documentation to ACT's Test Security Review Panel ("Review Panel") to help establish the validity of the April 2018 score. The letter further stated that if the Review Panel maintained the decision to cancel the April 2018 score, Harrison Cherdak could still choose to cancel his score voluntarily or take a private retest, or he could challenge the Review Panel's decision in binding arbitration before the American Arbitration Association ("AAA"). Harrison Cherdak chose to provide documentation to the Review Panel in support of the validity of his score, including a personal statement, high school transcript, and letters of recommendation.

On November 2, 2018, the Review Panel notified Harrison Cherdak by letter that after reviewing his submission, ACT would nevertheless cancel the April 2018 score based on the evidence that the score was not valid. The Review Panel explained the bases for this decision, including the substantial increase in his score as compared to the December 2017 test score, the fact that he was seated in close proximity to another test taker with whom he had unusual similarities in responses, and analysis of patterns in erasures and mathematical computations in his answer booklet as compared to those of the other test taker. The Review Panel noted that ACT

had not yet canceled his April 2018 test score and that he could continue to use his April 2018 score during the pendency of the review process. Harrison Cherdak, in fact, self-reported his April 2018 score in certain college applications and was accepted by the University of South Carolina, to enroll in the fall of 2019, and received over $100,000 in scholarship funding from that university.

Given ACT's position that the April 2018 score must be canceled, Harrison Cherdak elected to take a private retest, which was scheduled to occur on December 15, 2018. In order to confirm that the April 2018 test score was valid, Harrison Cherdak was required to achieve a Composite score of 29 or higher. According to the Cherdaks, there were irregularities during the private retest, including that the proctor failed to collect sufficient proof of Harrison Cherdak's identity, that the length of the test was reduced by approximately five minutes for certain sections, and that the proctor improperly retained the answer sheet in her car for two weeks before submitting it. Although the Cherdaks assert that ACT initially took the position that the test should not be scored because of these failures to adhere to testing protocols and requested that Harrison Cherdak take another private retest, when the Cherdaks refused to have Harrison Cherdak submit to another retest, ACT took the position, in a February 7, 2019 letter to Erik Cherdak, that the December 2018 test was a valid administration of the test and could be scored. In that letter, ACT asked the Cherdaks to decide whether Harrison Cherdak would agree to take another retest, have the December 2018 retest scored, or engage in arbitration.

III.    **Procedural History**

The Cherdaks responded to the February 7, 2019 letter by filing a lawsuit on April 22, 2019 in the Circuit Court for Montgomery County, Maryland alleging breach of contract and seeking a court order to prevent ACT from canceling the April 2018 score and from scoring the December

2018 retest. In addition, the Cherdaks filed a Motion for Temporary Restraining Order/Preliminary Injunctive Relief, which they later withdrew after arranging for an interim solution with counsel for ACT under which ACT agreed not to implement its decision to cancel the April 2018 score until the resolution of the litigation.

After ACT removed the case to this Court, the Cherdaks filed a First Amended Complaint ("the Complaint" or "FAC"). In summary, the Complaint asserts the following counts based on the Cherdaks' allegations that the ISR was wrongfully initiated and conducted against Harrison Cherdak: (I) breach of contract for ACT's failure to adhere to the Terms and Conditions in wrongfully instituting the ISR, deciding to cancel Harrison Cherdak's April 2018 test score, and failing to provide a single, secure, and reliable retesting process; (II) an action for a declaratory judgment that the two arbitration clauses (collectively, "the Arbitration Clauses") contained in ACT's Terms and Conditions are unenforceable; (III) an action for a declaratory judgment that the Arbitration Clauses do not bind Erik Cherdak; (IV) fraud based on allegedly false statements about ACT's test security and test integrity, Harrison Cherdak's April 2018 test score, and the ISR; (V) negligence in breaching ACT's alleged duties of care relating to the conduct of ISRs, test security, and score reporting; (VI) negligent misrepresentation based on allegedly negligent statements about ACT's test security and integrity and ACT's wrongful accusations of dishonest test taking; (VII) negligent supervision as to the conduct of the proctor who administered the December 15, 2018 private retest; (VIII) on behalf of Harrison Cherdak only, intentional infliction of emotional distress based on ACT's initiation of the ISR and wrongful accusations of cheating; (IX) unfair and deceptive trade practices, in violation of the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law § 13-301 (LexisNexis 2013), based on allegedly false representations about the quality and integrity of ACT's testing services and the conduct of the ISR; and (X) breach

of contract for violations of ACT's policies regarding the use of test scores and personal identifying information. The Cherdaks seek specific performance to prevent ACT from scoring the December 2018 retest and canceling the April 2018 score, damages in excess of $5,000,000, punitive damages, and attorney's fees. ACT maintains that it is willing to score the December 2018 retest and has provided assurances that it will not implement its decision to cancel the April 2018 score until the resolution of the litigation. The Cherdaks, however, have refused to permit ACT to score the test.

## DISCUSSION

In its Motion to Compel Arbitration and Stay Proceedings or, in the Alternative, to Dismiss for Failure to State a Claim, ACT seeks an order that this case is subject to binding arbitration and a stay of the case during the pendency of arbitration proceedings. In the alternative, ACT seeks dismissal on the grounds that the Complaint fails to state a plausible claim for relief. In turn, the Cherdaks have filed a Motion for a Preliminary Injunction seeking a court order to bar ACT from reporting any information about the ISR or its decision to cancel the April 2018 scores to Harrison Cherdak's university or third parties, and to prevent ACT from engaging in allegedly unlawful contracting practices with minors relating to the ACT test.

## I.     Motion to Compel Arbitration

ACT asserts that this dispute is subject to arbitration pursuant to the 2017-2018 Terms and Conditions that Harrison Cherdak signed, and that Erik Cherdak is also subject to arbitration because his claims are based upon his son's contractual relationship with ACT. The Cherdaks dispute that they are subject to the Arbitration Clauses because (1) they lack consideration or are based on illusory promises; and (2) they are unenforceable as unconscionable or against public policy, in part because of Harrison Cherdak's status as a minor at the time the contract was

8

executed. The Cherdaks also argue that the Arbitration Clauses should not be enforced based on the contract defenses of material breach by ACT, unclean hands, and fraud in the inducement.

### A.     Legal Standard

Judges in this District have recognized that "motions to compel arbitration exist in the netherworld between a motion to dismiss and a motion for summary judgment." *Caire v. Conifer Value Based Care, LLC*, 982 F. Supp. 2d 582, 589 (D. Md. 2013) (quoting *Shaffer v. ACS Gov't Servs., Inc.*, 321 F. Supp. 2d 682, 683 (D. Md. 2004)); *PC Const. Co. v. City of Salisbury*, 871 F. Supp. 2d 475, 477 (D. Md. 2012). Treating a motion to compel arbitration as a motion for summary judgment is proper where "the formation or validity of the arbitration agreement is in dispute," *Caire*, 982 F. Supp. 2d at 589, or where documents outside the pleadings must be considered "to effectively assess the merits of [the] motion," *Shaffer v. ACS Gov't Servs., Inc.*, 321 F. Supp. 2d 682, 683-84 (D. Md. 2004); *accord PC Const. Co.*, 871 F. Supp. 2d at 477 ("Whether the motion [to compel arbitration] should be treated as a motion to dismiss or a motion for summary judgment turns on whether the court must consider documents outside the pleadings."). *See also Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 85 & n.3 (4th Cir. 2016) (stating that under the Federal Arbitration Act, a party seeking a jury trial "must show genuine issues of material fact regarding the existence of an agreement to arbitrate," a standard that is "akin to the burden on summary judgment" (quoting *Chorley Enters. v. Dickey's Barbecue Rests.*, 807 F.3d 553, 564 (4th Cir. 2015))). Here, the Court will apply the summary judgment standard both because the parties dispute whether an arbitration agreement was properly formed and because resolving this dispute requires consideration of materials beyond the pleadings.

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the

moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

The request to compel arbitration is governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16 (2018), which provides that:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

*Id.* § 2. Upon a finding that an issue is "referable to arbitration under such an agreement," a court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement[.]" *Id.* § 3. Thus, a litigant in federal court may compel arbitration under the FAA upon a demonstration of: (1) the existence of a dispute between the parties; (2) a written agreement that includes an arbitration provision that purports to cover the dispute; (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce; and (4) the failure, neglect, or refusal of the other party to arbitrate the dispute. *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991). Here, the Cherdaks dispute only the second of these elements, arguing that there is no valid agreement to arbitrate their

claims against ACT and, in the event that the Arbitration Clauses are enforceable, that Erik Cherdak's claims are not covered by the arbitration provisions. In deciding whether such a valid arbitration agreement exists between the parties, the Court applies ordinary state law principles governing the formation of contracts. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

### B.    The Contract

The parties do not dispute that Harrison Cherdak entered into a contract with ACT in Maryland and that Maryland law applies in evaluating contract formation and interpretation. *See Kramer v. Bally's Park Place, Inc.*, 535 A.2d 466, 467 (Md. 1988) (stating that "the law of the jurisdiction where the contract was made controls its validity and construction"). However, as a threshold issue, the Cherdaks claim that the ACT's Terms and Conditions are a moving target, and it is unclear whether the 2017-2018 Terms and Conditions are actually controlling. These positions are unfounded.

Under Maryland law, contract terms are interpreted by considering the "customary, ordinary, and accepted meaning of the language used." *Fister v. Allstate Life Ins. Co.*, 783 A.2d 194, 199 (Md. 2001). When Harrison Cherdak registered for the April 2018 ACT test, he agreed to the 2017-2018 Terms and Conditions, which were in effect at that time. At the time he took the test, he provided written confirmation on his answer sheet that he was bound by those terms. The contract's plain language establishes that the Terms and Conditions are not subject to change within 48 hours of the test date. ACT asserts that no changes were made to the Terms and Conditions between the date of Harrison Cherdak's registration and the date of the April 2018 test, and the Cherdaks provide no evidence of any such change. Accordingly, the Court finds that the

2017-2018 Terms and Conditions constituted the contract entered into by ACT and Harrison Cherdak and that governed the parties' relationship as to the April 2018 ACT test.

## C. Consideration

The Cherdaks argue that the Arbitration Clauses may not be enforced because, as a matter of contract principles, there is insufficient consideration and the promises made are illusory. Agreements to arbitrate may be invalidated "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "To be binding and enforceable, contracts ordinarily require consideration" which, in Maryland, "may be established by showing a benefit to the promisor or a detriment to the promisee." *Cheek v. United Healthcare of the Mid-Atlantic, Inc.*, 835 A.2d 656, 661 (Md. 2003) (citations omitted). Consideration may take the form of "[f]orbearance to exercise a right or pursue a claim." *Id.* "A promise becomes consideration for another promise only when it constitutes a binding obligation. Without a binding obligation, sufficient consideration does not exist to support a legally enforceable agreement." *Id.* An illusory promise "appears to be a promise, but it does not actually bind or obligate the promisor to anything." *Id.* at 662. Because an illusory promise is not binding on the promisor, an illusory promise cannot provide consideration sufficient to support an enforceable contract. *Id.*

In *Cheek v. United Healthcare of the Mid-Atlantic, Inc.*, 835 A.2d 656 (Md. 2003), the Maryland Court of Appeals held that in determining whether there is adequate consideration for an arbitration provision, a court may not rely on consideration underlying the overall contract, but instead must find specific consideration for the agreement to arbitrate itself. *Id.* at 667. This rule is based on the fact that, under Maryland law, an arbitration clause is "an independently enforceable contract" that is "a severable part of the contract." *Id.* at 664-65 (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 402 (1967)); *see FOP Lodge No. 4 v. Balt. Cty.*,

57 A.3d 425, 432-33 (Md. 2012); *Holmes v. Coverall N. Am., Inc.*, 649 A.2d 365, 371 (Md. 1994) ("[A]n arbitration clause is severable from the entire contract."). Such an approach prevents courts from impermissibly "'straying into the prohibited morass of the merits of the claims' by looking to the parties' obligations (and their potential breach) underlying the lawsuit itself." *Noohi v. Toll Bros., Inc.*, 708 F.3d 599, 607 (4th Cir. 2013) (quoting *Cheek*, 835 A.2d at 665). Thus, in determining the validity of an arbitration clause in a contract, the provision "must be supported by consideration independent of the contract underlying it, namely, mutual obligation." *Id.* at 609.

Here, the Cherdaks argue that the Arbitration Clauses fail because ACT did not provide adequate consideration for Harrison Cherdak's agreement to be bound by arbitration. Consideration for one party's binding agreement to arbitrate disputes arising under a contract typically takes the form of a comparable agreement by the other party to do the same. Courts have accepted as consideration an agreement to be bound by the results of an arbitration of the other party's disputes. *See, e.g., Hill v. PeopleSoft USA, Inc.*, 412 F.3d 540, 544 (4th Cir. 2005) (finding sufficient consideration where both parties to the arbitration agreement were unambiguously bound to arbitrate all claims save certain enumerated exceptions). However, if an arbitration clause binds only one party, in that it requires that party to submit its disputes to arbitration and abide by the results, but does not bind the other party, it is unenforceable for lack of consideration. *See, e.g., Noohi*, 708 F.3d at 610-11.

The General Arbitration Clause is supported by consideration because it requires both parties—ACT and the test taker—to submit all disputes to arbitration. Although it does not affirmatively state that both ACT and the test taker are so bound, the general statement that "All disputes . . . shall be resolved by a single arbitrator through binding arbitration" evinces a mutual

promise to submit all claims to arbitration. T&C at 7; *see Noohi*, 708 F.3d at 610 (noting that the use of passive voice as in "it is agreed" would refer to a mutual agreement to submit to arbitration).

The ISR Arbitration Clause presents a different question. The language, phrased in the second person, refers to the test taker's obligation to submit any disputes relating to ISRs to arbitration, without explicitly referencing any obligation by ACT to do the same:

> For individual score reviews, the final and exclusive remedy available for you to appeal or otherwise challenge a decision by ACT to cancel your test score is binding arbitration. The arbitration will be conducted through written submissions to the American Arbitration Association ("AAA") unless both you and ACT agree to submit the matter to an alternative arbitration forum. By agreeing to arbitration in accordance with these Terms and Conditions, you are waiving your right to have your dispute heard by a judge or jury.

T&C at 6. In *Noohi*, an arbitration clause in a real estate contract stated in part that "Buyer . . . hereby agree[s] that any and all disputes with Seller . . . arising out of the Premises . . . shall be resolved by binding arbitration" and that "Buyer hereby waives the right to a proceeding in a court of law (including without limitation a trial by jury) for any claims or counterclaims brought pursuant to this agreement." *Noohi*, 708 F.3d at 610. The court held that this arbitration provision lacked consideration because it failed to bind both buyer and seller to submit their disputes to arbitration, where the plain language of the provision referred only to the buyer's promise to waive the right to proceed in court and submit all disputes to arbitration; referred only to potential disputes that would be raised by the buyer, not those potentially raised by the seller; imposed additional procedures that only the buyer was required to perform in order to initiate arbitration; and prohibited only the buyer from bringing any claim or counterclaims in court. *Id.* at 610-11.

Upon examination of the ISR Arbitration Clause, the Court finds that, as in *Noohi*, it is framed as establishing obligations on the test taker, not ACT. There is no language stating that ACT is bound by arbitration, must submit its own disputes relating to an ISR to arbitration, or is

waiving its right to have disputes heard by a judge or jury. Although there are references to a requirement that the parties mutually agree to use an arbitration forum other than the American Arbitration Association and to share the arbitration fee, in *Noohi*, there was likewise a requirement of mutual agreement on the arbitration forum, yet such language was insufficient to constitute consideration. *Noohi*, 708 F.3d at 609. Significantly, the fact that ACT phrased the ISR Arbitration Clause so differently from the General Arbitration Clause, which did provide mutual consideration, further illustrates that it was intended to impose an obligation to arbitrate only on the test taker, not ACT.

In a case pre-dating *Cheek* and *Noohi*, the United States Court of Appeals for the Fourth Circuit found a mutual agreement to arbitrate even though the arbitration clause referenced obligations of the employee only, such as "I agree to submit any complaints to the [arbitration] process and agree to abide by and accept *the final decision* of the arbitration panel as ultimate resolution of my complaints." *O'Neil v. Hilton Head Hospital*, 115 F.3d 272, 273 (4th Cir. 1997). In *O'Neil*, however, the court relied in part on language in an accompanying employee handbook explicitly stating that the employer was committed to accept the obligation to support the binding arbitration procedure. *Id.* at 275. No such language is present in the ISR Arbitration Clause. The court also relied on factors outside the plain language of the contract, specifically the facts that the employer proffered the contract to the employee and was taking the position in litigation that it was bound to arbitrate, as evidence of a binding commitment to arbitrate. *Id.* Where such factors are present in all arbitration clause disputes and would effectively compel a finding of mutual consideration regardless of the language of the arbitration clause, this Court finds the approach taken in *Noohi*, which did not consider such factors and instead relied on the plain language of the arbitration clause only, to be the more sound analysis. *Noohi*, 708 F.3d at 611. Based on the plain

language of the ISR Arbitration Clause, the Court finds a lack of consideration sufficient to support its enforceability. *See id.*

### D. Illusory Promise

Because the Court finds that the General Arbitration Clause was supported by consideration, it must consider the Cherdaks additional arguments to invalidate it. The Cherdaks further argue that the Arbitration Clauses are not enforceable as based on an illusory promise because ACT reserved the right to modify any or all of the Terms and Conditions up to 48 hours before the test. In *Cheek*, the Fourth Circuit invalidated an arbitration clause based on an illusory promise because the employer had retained the right to "alter, amend, modify, or revoke the [Arbitration] Policy at its sole and absolute discretion at any time with or without notice." *Cheek*, 835 A.2d at 662. The Cherdaks argue that the provision of the Terms and Conditions in which ACT reserves the right to modify the Terms and Conditions up to 48 hours before the test likewise renders the promise to be bound by arbitration an illusory.

The modification provision in the Terms and Conditions, which notified test takers that they should check for any modifications two days before the test and which permitted them to terminate the contract if they did not agree with any changes, is not as one-sided as the provision in *Cheek*. The Court, however, need not decide whether it constitutes an illusory promise. Among other arguments, ACT contends that this modification provision is not part of the Arbitration Clauses and therefore may not be considered in assessing the enforceability of those clauses. In *Hill v. PeopleSoft USA, Inc.*, 412 F.3d 540 (4th Cir. 2005), the Fourth Circuit, applying Maryland law, concluded that a general provision permitting PeopleSoft to change "without notice" its dispute resolution program, the third step of which was binding arbitration, did not render the promise to arbitrate illusory because under *Cheek*, the court could not look beyond the arbitration

agreement itself to assess whether it was supported by consideration. *Id.* at 543. Unlike in *Cheek*, where the unilateral right to modify the contract was contained in, and applied specifically to, the arbitration provision, the modification provision in *Hill* was outside the confines of the arbitration clause and therefore did not affect the question of consideration. *Id.* at 544. Likewise, the modification provision in the Terms and Conditions is outside of the Arbitration Clauses and not specifically directed at the agreement to arbitrate. Under these circumstances, the Court concludes that ACT's general ability to modify the Terms and Conditions does not constitute an illusory promise under the Arbitration Clauses that renders those provisions unenforceable. *See Hill*, 412 F.3d at 544; *Cheek*, 835 A.2d at 669 (stating that "an arbitration clause of a larger is contract" is "severable therefrom").

### E. Contracting with a Minor

The Cherdaks next argue that the Arbitration Clauses, even if supported by consideration, are void as unconscionable contracts of adhesion, particularly because Harrison Cherdak was a minor at the time of contracting, and he had no other option but to agree to ACT's terms and conditions because taking the test is a necessary prerequisite to applying for college. The FAA "permits agreements to arbitrate to be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability, but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *AT&T Mobility, LLC v. Concepcion*, 563 U.S. 333, 339 (2011). "An unconscionable bargain or contract has been defined as one characterized by extreme unfairness, which is made evident by (1) one party's lack of meaningful choice, and (2) contractual terms that unreasonably favor the other party." *Walther v. Sovereign Bank*, 872 A.2d 735, 743 (Md. 2005) (citations omitted).

On the issue of Harrison Cherdak's age at the time of the contract, the Cherdaks acknowledge that minors may enter into contracts, but they argue that a minor such as Harrison Cherdak would have faced a clear inequality of bargaining power and would not have had the ability to understand all of the terms in this type of contract, such as the Arbitration Clauses, particularly the waiver of the right to a jury trial. The Court need not decided whether, in combination with other factors, Harrison Cherdak's status as a minor rendered the contract unconscionable because, under Maryland law, minors may void contracts other than those for life necessities. *Schmidt v. Prince George's Hospital*, 784 A.2d 1112, 1116, 1122 (Md. 2001) "Generally, the law regards contractual obligations of minors as voidable, giving the minor child the choice whether to avoid the contract, or to perform it." *Id.* at 1122. Minors may avoid such "contracts entered into by them with adults under the presumption that unequal bargaining power always exists between the two, with the power, and therefore, the potential for overreaching, inuring to the adult." *Johns Hopkins Hosp. v. Pepper*, 697 A.2d 1358, 1364 (Md. 1997). Maryland law thus strikes a balance between minors' acknowledged vulnerability and the reality of their need at times to enter into contractual agreements by allowing individuals under age 18 to void contracts except to the extent that they are liable for the value of necessary goods or services, such as food, clothing, or medical care, already provided to them. *Schmidt*, 784 A.2d at 1116. "[O]nly after a minor has disaffirmed the contract . . . may the contract ordinarily be considered null and void." *Id.* Such disaffirmance must occur "within a reasonable time" after the minor attains the age of majority. *McBriety v. Spear*, 60 A.2d 528, 530 (Md. 1948).

As discussed above, under Maryland law, arbitration clauses are independently enforceable contracts severable from the contract in which they are contained. *See Cheek*, 835 A.2d at 664-65; *FOP Lodge No. 4*, 57 A.3d at 432-33; *Holmes*, 649 A.2d at 371. Because the Arbitration

18

Clauses are not contracts for necessary goods and services, Harrison Cherdak may void them because it is undisputed that he entered into them while a minor. He may, but is not required to, void the separate, severable contract for test services contained in the Terms and Conditions. Indeed, given the complexity and importance of the questions whether to accept binding arbitration, to waive the right to have disputes decided by a judge and jury, and to waive the potential recovery of damages, issues on which it would be unfair to expect a minor to make an informed decision, the present case illustrates the wisdom of the Maryland rule that contracts entered into by minors are voidable.

ACT argues that a test taker who is under age 18 need not be treated differently than an adult because, during the registration process, test takers are prompted to identify who, if anyone, assisted the student with the registration, and the test taker may select options including that: (1) the test taker registered without assistance; (2) a parent or legal guardian assisted; (3) a counselor, teacher, or other school staff member assisted; and (4) another unspecified individual assisted. Such a question is not a substitute for a parent or legal guardian co-signing the contract. The question merely asks whether anyone assisted the test taker and provides as the first option that no one assisted. It in no way advises, encourages, or requires a test taker to consult with a parent or other adult before accepting the Terms and Conditions. Had ACT wanted a binding arbitration clause that was not voidable under Maryland law, it would have required a parent or legal guardian to sign with or on behalf of an underaged test taker. *See Schmidt*, 784 A.2d at 1122.

Accordingly, where the Cherdaks have already requested that the Arbitration Clauses be severed and voided, the Court concludes that based on this request, those clauses will be voided due to Harrison Cherdak's minor status at the time of contracting, and thus deemed unenforceable. The Court therefore need not reach the Cherdaks' specific argument on unconscionability and their

other arguments for invalidating the Arbitration Clauses. Based on both the lack of consideration for the ISR Arbitration Clause and Harrison Cherdak's right to void both Arbitration Clauses, the Motion to Compel Arbitration will be denied.

## II.   Motion to Dismiss

In the alternative, ACT argues that the Complaint should be dismissed. First, ACT argues that all claims by Erik Cherdak should be dismissed because he lacks standing, was not a party to the Terms and Conditions, and is owed no statutory or tort duty by ACT. Second, ACT more generally asserts that every count should be dismissed where the Complaint is verbose and redundant rather than "a short plain statement" of their claims, Fed. R. Civ. P. 8(a)(2), and the pleading fails to allege sufficient facts stating any viable claim, Fed. R. Civ. P. 12(b)(6).

### A.   Legal Standard

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although courts should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), legal conclusions or conclusory statements do not suffice, *Iqbal*, 556 U.S. at 678. The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

### B.   Erik Cherdak

As a threshold issue, ACT argues that Erik Cherdak lacks standing to assert any claims against ACT and should be dismissed from the case. To have standing under Article III of the

United States Constitution, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). In the Complaint, Erik Cherdak alleges that as a result of ACT's conduct toward Harrison Cherdak, he has suffered pain and anguish from the stress of his son going through the ISR process; he continues to incur out-of-pocket expenses associated with this dispute, including legal fees and professional counseling services for Harrison Cherdak; he has spent time marshaling evidence for the Review Panel; and he will have to expend significant resources to make up for lost scholarships and benefits Harrison Cherdak has received, in the event that the April 2018 score is canceled and this fact is disclosed to the University of South Carolina. Although several of these categories of injury are likely not cognizable for standing purposes, the potential financial loss to Erik Cherdak associated with higher college costs for his son could arguably constitute an injury traceable to alleged misconduct by ACT. In order to make such a determination, the Court would require additional information, such as facts relating to whether and how the University of South Carolina requires a parent to contribute to the cost of a student's education. Thus, the Court is not prepared, on this record, to find categorically that Erik Cherdak lacks standing. However, the Court need not resolve this issue because it finds, as discussed below, that Erik Cherdak has failed to state a plausible claim for relief on any of his asserted causes of action.

### C.     Breach of Contract

The Cherdaks assert breach of contract claims in Counts I and X. In Count I, they assert that the 2017-2018 Terms and Conditions constituted a contract, and that ACT breached that contract by: (1) instituting an ISR without proof of wrongdoing by Harrison Cherdak; and (2) deciding to cancel his April 2018 test score after failing to have its Review Panel conduct a

meaningful review of his materials submitted as part of the ISR process, failing to conduct a proper private retest of Harrison Cherdak, and unreasonably demanding that he take a second private retest. In Count X, the Cherdaks assert that ACT breached the same contract by sending personal information relating to Harrison Cherdak to a representative of a university not authorized to receive that information.

To establish a breach of contract under Maryland law, a plaintiff must prove "that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001). Here, it is beyond dispute that Erik Cherdak is not a party to the Terms and Conditions or any other contract with ACT. The Terms and Conditions were executed between Harrison Cherdak and ACT and, by their plain terms, apply only to Harrison Cherdak as the test taker, and explicitly state that they "do not create a third-party beneficiary relationship between ACT and any individual or entity other than you." T&C at 4. Because Erik Cherdak has not plausibly alleged that he was a party to the contract, his breach of contract claims will be dismissed.

However, Harrison Cherdak has stated a claim for breach of contract in Count I. Where the Terms and Conditions provide that an ISR may be initiated if "ACT discovers any reason to believe your score may be invalid," T&C at 6, Harrison Cherdak's allegation that there was no proof or basis for ACT to believe that his April 2018 score was invalid, bolstered by the facts asserted about his prior academic history as submitted to the Review Panel, supports a claim for breach of this provision.

The ISR Provision of the Terms and Conditions states that "ACT reserves the right to cancel test scores when there is reason to believe the scores are invalid. Proof of misconduct is not required to cancel scores." *Id.* Construed liberally, Harrison Cherdak has alleged ACT's

22

determination to cancel his April 2018 test score breaches the contract because there is no valid reason to believe his score was invalid. In support of this claim, he argues that there was no meaningful review of his personal statement and materials submitted to the Review Panel, that the private retest was invalid because of procedural irregularities, and that ACT's demand that Harrison Cherdak submit to another private retest was not reasonable. Although the bar for canceling scores is low, requiring only a "reason to believe" the score is invalid, where the Court must view the allegations in the light most favorable to the plaintiff, the Court finds that he has stated a claim for breach of contract relating to the decision to cancel his score. *Id.*

The Court notes, however, that there does not appear to be a valid breach of contract claim arising solely from the discrete alleged irregularities in the private retest. The Terms and Conditions provide that ACT may examine any compromise or disruption to a test, including "mistiming on any part of the test" or problems in the handling or processing of answer sheets, and "in its sole discretion" take responsive action, such as by not scoring the test, canceling the score, or offering a retest at no additional fee. *Id.* "Decisions made by ACT regarding such compromises or disruptions in the testing process are final." *Id.* Thus, even if, as alleged by Harrison Cherdak, the proctor mistimed the test or improperly failed to submit the answer sheet in a timely manner, where he acknowledges that ACT has offered a retest at no additional fee, it does not appear that he has a breach of the contract on this basis. Likewise, based on the language of the Terms and Conditions, there does not appear to be a valid claim of breach of contract based specifically on ACT's alleged failure to have its Review Panel conduct a meaningful review of his materials submitted as part of the ISR process, or by demanding that Harrison Cherdak take a second private retest. The contract appears silent on the activities of Review Panels or the conduct of private retests. To the extent that Harrison Cherdak has characterized the proposed second

private retest as a second ISR, there is no language in the Terms and Conditions that bars a second ISR. Thus, it appears that the Review Panel's consideration of the submitted materials, the alleged deficiencies in the private retest, and the request that Harrison Cherdak take a second private retest are facts relevant to the breach of contract claim, but not discrete claims of their own. Nevertheless, at this stage, the Court need not decide these issues. Because Harrison Cherdak has stated a plausible claim that, based on this overall course of conduct, ACT breached the contract by initiating an ISR and deciding to cancel his April 2018 test score without a reason to believe that the score was invalid, the Court will deny the Motion to Dismiss as to Count I.

In Count X, Harrison Cherdak also asserts a breach of contract claim based on the alleged unauthorized release of a "College Report" containing his personally identifying information to Dr. Buela Manuel from the Washington Adventist University. FAC ¶¶ 127-28, ECF No. 19. The Complaint itself, however, acknowledges that Manuel was a proposed proctor who received personally identifying information about Harrison Cherdak in connection with being directed to administer a second private retest in April 2019. Accordingly, her receipt of any personal information relating to Harrison Cherdak was consistent with the Terms and Conditions, which provide that by registering or taking an ACT test, a student consents to ACT's Privacy Policy, which in turn allows ACT to disclose this information "to others providing services to ACT or as necessary to deliver ACT's assessments, programs and services." T&C at 8. Particularly where there is no allegation that Manuel publicly disclosed personally identifying information she received in connection with preparing to proctor the exam and thus caused harm to Harrison Cherdak, the Court finds that these allegations do not state a plausible claim for breach of contract in Count X. This count will be dismissed.

## D. Declaratory Judgment

In Counts II and III, the Cherdaks seek a declaratory judgment regarding the validity and effect of the Terms and Conditions' Arbitration Clauses. In light of this Court's resolution of ACT's Motion to Compel Arbitration and Stay Proceedings, *see supra* part I, the Cherdaks' declaratory judgment claims will be dismissed as moot.

## E. Negligence

In Counts V, VI, and VII, the Cherdaks allege claims of negligence, negligent misrepresentation, and negligent supervision. To establish a negligence claim, a plaintiff must allege: (1) the breach of a duty of care owed to the plaintiff; (2) "a legally cognizable causal relationship between the breach of duty and the harm suffered"; and (3) damages. *Jacques v. First Nat'l Bank of Maryland*, 515 A.2d 756, 758 (Md. 1986). "Absent a duty of care there can be no liability in negligence." *Id.* Where the sole alleged harm is economic loss, rather than "physical injury or risk of severe physical injury or death," *Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLC*, 155 A.3d 445, 452 (Md. 2017), a duty of care exists only if there is an "intimate nexus between the parties" such as "contractual privity or its equivalent," *Jacques*, 515 A.2d at 759-60. An intimate nexus will be found where "linking conduct" demonstrates that "the defendant knew or should have known of the plaintiff's reliance" on the defendant exercising due care. *Balfour*, 155 A.3d at 457. In assessing whether such a nexus exists, "context is critical." *Id.*

Maryland courts have found an intimate nexus between a public bean weigher and a customer, where the weigher held itself out as "skilled and careful" in weighing the product for eventual purchase; between a bank and a customer, where the customer relied on the bank to use reasonable care in processing a loan application critical to locking in a specific interest rate; and between an employer and an employee, where during pre-employment negotiations an employer

made a promise inducing the employee to leave a former employer, and the employer had reason to know that negligence in making misrepresentations could cause considerable economic harm to the employee. *Id.* 454-57 (citing cases). Such scenarios reveal relationships akin to privity where one party was "particularly vulnerable and dependent" or acting in "reliance" on the other's exercise of due care. *Id.* at 455-56 (citations omitted).

Here, Harrison Cherdak has alleged sufficient facts to support a plausible claim that ACT owned him a duty of care in tort. First, he is, in fact, in privity to ACT through the Terms and Conditions, which notably asserts that ACT takes steps to ensure that "tests are properly administered" and that "tests and answer documents are properly handled and scored." T&C at 6. *See Mesmer v. Md. Auto. Ins. Fund*, 725 A.2d 1053, 1059 (Md. 1999) (stating that "when the defendant has proceeded on the basis that a contractual obligation exists, has undertaken that obligation, and has undertaken it in violation of the appropriate standard of care . . . the plaintiff may, in some circumstances, maintain a tort action"). Moreover, there is arguably an intimate nexus because Harrison Cherdak is entirely dependent on ACT to score his test properly, to act reasonably in any ISRs, and to administer tests—including private retests—with reasonable care. From the allegations in the Complaint, it is reasonable to infer that ACT is aware that students like Harrison Cherdak rely on ACT to act with due care, and that failure to do so can have severe consequences. If an honestly earned score is canceled as a result of negligence, it is entirely foreseeable that the action could affect the test taker's college prospects. Moreover, given the significant time investment associated with preparing for the ACT, a student compelled to take a private retest unjustifiably, or to take a second private retest due to negligent errors in the administration of the first test, would be significantly harmed.

Thus, Harrison Cherdak has fairly pleaded that: (1) ACT owed him a duty of care in evaluating his test score in April 2018 and properly administering the December 2018 private retest; (2) ACT breached these duties when it commenced an ISR wrongfully accusing him of cheating, and when ACT's employee mistimed certain sections of the December 2018 retest— intended to provide Harrison Cherdak the opportunity to confirm his original score—by cutting off as much as five minutes per section on the exam; and (3) this negligence caused him monetary and emotional harm for which he seeks damages. These allegations, taken as true, are sufficient at this stage for Harrison Cherdak to advance his negligence claims. *See Mesmer*, 725 A.2d at 1059. Where the negligent supervision claim is closely intertwined in that it is premised on ACT's alleged failure to ensure that its proctor administered the private retest in accordance with its duty of care, Harrison Cherdak has also stated a plausible claim in Count VII. *See Marrick Homes LLC v. Rutkowski*, 161 A.3d 53, 65 (Md. Ct. Spec. App. 2017) (noting that "the elements of negligent supervision are identical to the elements of a general negligence claim").

The Court, however, will grant the Motion to Dismiss as to the negligent misrepresentation claim. Such a claim requires that: (1) the defendant owes a duty of care to the plaintiff and negligently asserts a false statement; (2) the defendant intends for the statement to be acted upon by the plaintiff; (3) the defendant knows that the plaintiff will probably rely on the statement such that injury will result; (4) the plaintiff justifiably takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the negligence. *Martens Chevrolet, Inc. v. Seney*, 439 A.2d 534, 539 (Md. 1982). First, the claim is inherently flawed because it is based on the allegation that ACT made "knowingly false statements it never intended to honor." FAC ¶ 99. Thus, on its face, the Complaint asserts intentional falsehoods, not negligent misrepresentations, and thus does not fairly state a plausible claim for relief. *See Iqbal*, 556 U.S. at 678. Second, the

Complaint fails to articulate a plausible theory on how the Cherdaks detrimentally relied on any negligent statements. The Complaint alleges that Harrison Cherdak demonstrated reliance by entering into the "ACT's online adhesion contract." FAC ¶ 99. That action, however, occurred before any of the alleged misrepresentations relating to whether Harrison Cherdak acted dishonestly during the April 2018 test and thus cannot logically constitute a form of reliance on the later statements. To the extent that the Complaint may be asserting that the alleged misrepresentations were pre-contract statements that ACT "would ensure . . . test security and test integrity," *id.*, no such guarantee was made. There are no allegations of any oral representations made by ACT to Harrison Cherdak before he signed the contract. Rather, the only statements made are those in the Terms and Conditions, which do not promise test security and integrity and instead specifically acknowledge that there could be an "error or other occurrence that compromises or disrupts the testing process." T&C at 6. Where the Complaint does not state a plausible basis for relief under this theory, the negligent misrepresentation count will be dismissed.

Finally, the Court will grant the Motion to Dismiss as to all negligence claims asserted on behalf of Erik Cherdak. As discussed above, he has no contractual relationship with ACT. Nor does he have an intimate nexus that is equivalent to privity because his relationship with ACT is too far removed. The scope of liability would be cast too broadly if the duty of care owed to a test taker were extended to the test taker's parent. The Court is aware of no authority supporting such a conclusion. Under such a rule, a bank owing a duty of care to a bank customer, as discussed in *Balfour* and *Jacques*, would also owe a tort duty to that customer's parents if they were emotionally invested in their child's home purchase or planned to assist their child financially. *See Balfour*, 155 A.3d at 454-55; *Jacques*, 515 A.2d at 756. Because Erik Cherdak cannot establish the duty

element of any negligence claim, the Court will dismiss his tort claims. *See Jacques*, 515 A.2d at 758.

### F.    Fraud and the MCPA

Upon reviewing the Complaint, the Court will also dismiss the Cherdaks' common law fraud and MCPA counts for failure to state a claim. To allege fraud in Maryland, a plaintiff must demonstrate that (1) the defendant made a false representation to the plaintiff; (2) the defendant either knew the misrepresentation was false or made the misrepresentation with "reckless indifference to its truth"; (3) the defendant made the misrepresentation for the purpose of defrauding the plaintiff; (4) the plaintiff relied on the misrepresentation and had the right to rely on it; and (5) the plaintiff, as a result of the misrepresentation, suffered some compensable injury. *Nails v. S & R, Inc.*, 639 A.2d 660, 668 (Md. 1994).

To state an MCPA claim, a plaintiff bringing a private action must adequately plead that: (1) the defendant engaged in an unfair or deceptive practice or misrepresentation; (2) the plaintiff relied upon the representation; and (3) doing so caused the plaintiff actual injury. *Stewart v. Bierman*, 859 F. Supp. 2d 754, 768-69 (D. Md. 2012) (citing *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 277 (Md. 2007)), *aff'd sub nom. Lembach v. Bierman*, 528 F. App'x 297 (4th Cir. 2013). An "unfair or deceptive" trade practice includes a "false . . . or misleading oral or written statement . . . or other representation . . . which has the capacity, tendency, or effect of deceiving or misleading consumers." Md. Code Ann., Com. Law § 13-301(1).

Because the Cherdaks' allegations sound in fraud, they are subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b). *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). Under this heightened pleading standard, the Cherdaks must allege "the time, place,

and contents" of the fraudulent representation, the identity of the person who made the misrepresentation, and "what he obtained thereby." *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).

Even construing the Cherdaks' allegations in the best possible light, the Court finds that they fail to state a plausible claim for relief. The allegations of fraud or deceptive trade practices primarily consist of the claim that ACT made numerous knowingly false statements in the course of initiating and conducting the ISR against Harrison Cherdak, in persisting in seeking to cancel his April 2018 test score, and in the conduct of the allegedly flawed private retest. The Cherdaks' sweeping allegations of false statements relating to ACT's general provision of measures to ensure the integrity of the conduct of ACT tests, and to the specific private retest of Harrison Cherdak, do not meet the requirements of Rule 9 in that they do not identify specific statements and the time, place, and identity of the speaker of such statements. *See Harrison*, 176 F.3d at 784. The Cherdaks do identify one specific allegedly false statement made "in late September 2018," when an ACT employee named "Mr. Ron" advised them that the option of providing documentation to the Review Panel was the "best" approach under the circumstances, and expressed that it would "very likely" conclude the ISR and preserve Harrison Cherdak's April 2018 score. FAC ¶ 83. Even if these statements were made, a false statement "must be a misrepresentation of material fact . . . It cannot be an estimate or opinion." *Parker v. Columbia Bank*, 604 A.2d 521, 528 (Md. 1992). The identified statements, on their face, are merely estimates or opinions and do not constitute actionable statements of fact. Relatedly, statements that an ACT counsel demanded that Harrison Cherdak backdate documents and threatened to cancel Harrison Cherdak's test scores, and that the test proctor told Harrison Cherdak of a plan to hold a private retest on April 12, 2019, are not alleged to be false and thus do not support these causes of action.

More generally, the Cherdaks also allege fraud and deceptive trade practices based on broad claims that ACT deliberately fails to follow its own rules and policies relating to testing integrity and makes false representations about the quality of its testing services. The Cherdaks also make the conclusory claim that ACT is "operating a scheme to extract monies from test-takers" by delaying decisions on whether to proceed with an ISR for months in order to secure greater profits. FAC ¶ 82. These allegations also fail to identify specific false statements with sufficient particularity to comply with Rule 9(b) and do not coherently articulate how ACT would benefit from such delayed conduct. Likewise, the vague statements that ACT engages in "immoral and unethical contract practices," "attempted corruption of a minor child through nefarious conduct," and "disingenuously [made] up rules" to have Harrison Cherdak "take the fall" for ACT's wrongful conduct, *id.* ¶ 123, are insufficient under Rule 9(b)'s heightened pleading standard to state a claim for violation of the MPCA. Fed. R. Civ. P. 9(b).

Beyond these pleading deficiencies, the Court concludes that the Cherdaks' fraud and MPCA allegations do not include factual allegations that would support a plausible conclusion that ACT engaged in fraud or deceptive trade practices. As discussed above, the Terms and Conditions do not promise the absence of, and explicitly contemplate, errors in its testing processes and thus on their face do not falsely or deceptively promise a lack of deficiencies in the administration of tests or retests. *See supra* part II.E. Moreover, although the Cherdaks have offered facts that are arguably consistent with the initiation of an unjustified ISR, an incorrect decision to cancel Harrison Cherdak's April 2018 test score, and a flawed private retest, these facts do not plausibly support a finding of an intentional, deliberate campaign to use false statements to defraud the Cherdaks specifically or ACT test takers generally. Such overreaching and unsupported claims will be dismissed without prejudice. *See Iqbal*, 556 U.S. at 678. To the extent that concrete facts

unearthed in discovery could support such claims of fraud, the Cherdaks could later seek leave to amend the Complaint at that time. The Motion will be granted as to Counts IV (fraud) and IX (MPCA).

## G.    Intentional Infliction of Emotional Distress

The Cherdaks assert an intentional infliction of emotional distress ("IIED") claim on behalf of Harrison Cherdak only. Specifically, they allege that due to the ISR, Harrison Cherdak worries about his future, suffers "tremendous headaches" and "loss of sleep," and has received medical treatment for his physical pain and mental anguish. FAC ¶ 119. To state an IIED claim under Maryland law, a plaintiff must show (1) intentional or reckless conduct; (2) that was extreme and outrageous; (3) the plaintiff suffered severe emotional distress; and (4) there was a causal connection between the conduct and the emotional distress. *Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977). At a minimum, the Complaint does not allege sufficient facts to meet the second and third elements. A defendant is only liable for IIED if the conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 614 (quoting Restatement (Second) of Torts § 46 cmt. d (American Law Inst. 1965)). In addition, a plaintiff must "show that he suffered a *severely* disabling emotional response to the defendant's conduct." *Id.* at 616. Emotional distress must be "so severe that no reasonable man could be expected to endure it." *Id.* (quoting Restatement (Second) of Torts § 46 cmt. j). While having the validity of his test score questioned in an ISR is no doubt upsetting and highly stressful, ACT's alleged conduct and Harrison Cherdak's alleged emotional distress do not clear the high bar that Maryland courts have set for IIED claims. *See Harris*, 380 A.2d at 615-17; *Batson v. Shiflett*, 602 A.2d 1191, 1216-17

32

(Md. 1992) (collecting cases); *Manikhi v. Mass Transit Admin.*, 758 A.2d 95, 114-15 (Md. 2000) (collecting cases). Accordingly, the IIED claim in Count VIII will be dismissed.

### III. Motion for Preliminary Injunction

In their Motion, the Cherdaks seek a preliminary injunction, barring ACT from: (1) maintaining an improperly initiated ISR against Harrison Cherdak; (2) reporting any information related to the ISR to the University of South Carolina or any other third party; (3) reporting any information related to its decision to cancel the April 2018 test score; and (4) knowingly engaging in illegal contracting practices with minors. To obtain a preliminary injunction, moving parties must establish that: (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *see Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). A moving party must satisfy each requirement as articulated. *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009), *judgment vacated on other grounds*, 559 U.S. 1089 (2010). Because a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

The Cherdaks fail to demonstrate that such an extraordinary remedy is warranted here. In particular, there has been no showing of a likelihood of irreparable harm. The harm the Cherdaks foresee, ACT's alleged impending cancellation of Harrison Cherdak's April 2018 test score and the disclosure of the circumstances of the ISR to his college, is neither "actual" nor "imminent." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989)). On September 25, 2019,

ACT's counsel sent a letter to Erik Cherdak confirming that ACT will not cancel the April 2018 score unless and until an arbitrator or this Court decides that the scores may be canceled, or the ISR is concluded through other means, such as if Harrison Cherdak himself requests the score be canceled. This position is consistent with previous communications between the parties in September 2018, May 2019, and April 2019, in which ACT acknowledged that while an ISR is pending, the questioned score continues to be treated as valid and agreed that no cancellation or disclosure would occur while the Cherdaks' lawsuit remains pending.

While the Cherdaks take issue with ACT reserving the right to correct any inaccurate statements they may make to colleges or universities about his ACT score, ACT has stated that it does not anticipate the need to do so, and neither ACT nor the Cherdaks alleged in the motion that the Cherdaks made new, inaccurate statements warranting ACT's correction. In the multiple months since this case was removed to this Court, ACT honored its non-disclosure commitment to the Cherdaks. Thus, the Cherdaks have failed to satisfy the second *Winter* factor. Because all must be satisfied, the Court need not address the remaining factors. The Motion for a Preliminary Injunction will be denied.

However, because the Cherdaks have just asserted in a recent Notice to the Court that they now have new evidence of misconduct by ACT that could alter the likelihood of irreparable harm, the motion will be denied without prejudice to renewal based on new facts after the matter is first discussed at a pre-motion conference to be scheduled.

## CONCLUSION

For the foregoing reasons, ACT's Motion to Compel Arbitration and Stay Proceedings or, in the Alternative, to Dismiss for Failure to State a Claim will be GRANTED IN PART and DENIED IN PART. The Motion to Compel Arbitration and Stay Proceedings will be denied. The

Motion to Dismiss will be granted as to all claims asserted by Erik Cherdak; Counts II and III, which are dismissed as moot; the fraud, negligent misrepresentation, intentional infliction of emotional distress claims, and MCPA claims (Counts IV, VI, VIII, and IX, respectively); and the breach of contract claim in Count X. The Motion to Dismiss will be denied as to Harrison Cherdak's breach of contract claim in Count I, negligence claim in count V, and negligent supervision claim in count VII. The Cherdaks' Motion for a Preliminary Injunction will be DENIED WITHOUT PREJUDICE. A separate Order shall issue.

Date: February 4, 2020

THEODORE D. CHUANG
United States District Judge